## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | **THOMAS W. OLICK** | : | **Chapter 13** |
| | | : | |
| | **Debtor** | : | **Bky. No.  07-10880 ELF** |
| | | : | |
| | | : | |
| **THOMAS W. OLICK,** | | : | |
| | | : | |
| | **Plaintiff** | : | |
| | | : | |
| **v.** | | : | |
| | | : | **Adv. No. 10-038** |
| **WILLIAM C. HOUSE,** | | : | |
| | | : | |
| | **Defendant** | : | |
| | | : | |

# M E M O R A N D U M

## I.  INTRODUCTION

The events giving rise to this adversary proceeding occurred in the mid-to-late 1990's, almost twenty (20) years ago.  Thomas W. Olick ("the Debtor" or "Olick"), acting pro se, asserts claims against his former attorney, William C. House ("House").  Olick's claims against House arise from House's representation of Olick in: (a) a chapter 13 bankruptcy case that Olick commenced in 1996 and (b) an affirmative claim Olick was pursuing in another forum during the pendency of that 1996 bankruptcy case.

The 1996 bankruptcy case has long been closed.

Olick filed a subsequent chapter 13 bankruptcy case in 2007.  This adversary proceeding was filed in 2010 as part of the 2007 bankruptcy case.  The administration of the 2007 bankruptcy case, too, has long been completed.  Olick received his chapter 13 discharge on

1

March 6, 2012.  (Bky. No. 07-10880, Doc. # 225).  The pendency of this adversary proceeding is

the only reason that the 2007 bankruptcy case remains open.

As one might infer from this skeletal history, and as I will detail more fully below, the

procedural history of this matter is long and tortuous, perhaps attributable to the fact that both

parties (one an attorney and one not) have represented themselves throughout, but certainly due

to their epic, mutual animosity.

Presently before the court is House's motion for summary judgment.

Based on  the summary judgment evidentiary record, I concludethat:

(1) Olick has not met his burden of establishing that he has evidence to present at
trial to prove every element of each of his claims; and

(2) Alternatively, Olick's claims are barred by the statute of limitations.

Therefore, I will grant House's motion and enter judgment in his favor and against

Olick.[1]

---

[1]    This adversary proceeding was filed prior to confirmation of the Debtor's chapter 13
plan.  Because it involved a claim to bring money into the bankruptcy estate, I concluded that the court
had subject matter jurisdiction as a proceeding "related to" the bankruptcy case.  See 11 U.S.C. §1334(b);
28 U.S.C. §157(b)(2)(A), (O).  In a related proceeding, I may enter a final order only with the consent of
the parties.  28 U.S.C. §157(c)(2).  Here, the parties have so consented. (See Olick's Pretrial Statement,
Doc. # 236 at 1-2; House's Pretrial Statement, Doc. # 237, at 3).

## II.  PROCEDURAL HISTORY

### A.  Olick's <u>Pro Se</u> Status

Since 1993, Olick has filed six (6) personal bankruptcy cases in this court[2] and, in connection with those cases, more than sixty (60) adversary proceedings.

Prior to 2006, the cases and adversary proceedings were assigned to the Reading division of the court.  On February 21, 2006, the recusal of the newly appointed bankruptcy judge sitting in Reading caused all of Olick's matters to be transferred to the undersigned judge in the Philadelphia division.  The cases and adversary proceedings that Olick has filed since February 21, 2006 also have all been heard in the Philadelphia division.

In most of the cases and proceedings in the Reading division between 1993 and 2006[3] and in every one of the cases and proceedings in the Philadelphia division since 2006, Olick has represented himself.

### B.  Olick's "Main" Bankruptcy Cases

All of Olick's bankruptcy cases, except for the last one filed in 2013, were filed under

---

[2]        (<u>See</u> Bky. Nos. 93-21726; 93-23114; 96-22123; 01-25353; 07-10880; 13-10249).

[3]        The docket reflects that Olick and his spouse were initially represented by counsel in the short-lived first chapter 13 case and in the second chapter 13 bankruptcy case, both filed in 1993, but that counsel withdrew his appearance in the second case with court approval, on March 22, 1995.  (<u>See</u> Bky. No. 93-21726; Bky. No. 93-23114, Docket Entry No. 174).  As far as I can tell, with the exception of House's representation in the next bankruptcy case, Olick has proceeded <u>pro se</u> since then in every bankruptcy matter (and numerous appeals) thereafter.  Unquestionably, Olick has proceeded <u>pro se</u> in all of the proceedings heard in the Philadelphia division since February 2006.

chapter 13.

His first bankruptcy case was filed, jointly with his spouse on June 3, 1993, but was

dismissed shortly thereafter on July 19, 1993.  (Bky. No. 93-21726).  The second chapter 13 case,

also a joint case, was filed on October 26, 1993 and was dismissed on September 22, 1997.

(Bky. No. 93-23114).

While the second case was still pending, Olick filed his third bankruptcy case, again

jointly with his wife, on July 11, 1996 ("the 1996 Bankruptcy Case").  (See Bky. No. 96-22123).[4]

Olick's chapter 13 plan was confirmed on January 25, 1999 and he completed his payment

obligations under the plan by July 2000.  (Bky. No. 96-22123, Doc. #'s 718, 720).[5]  The case

nevertheless remained open due to the pendency of numerous adversary proceedings and various

appeals.[6]  Olick and his spouse finally received their chapter 13 discharge on September 26,

2006.  (Bky. No. 96-22123, Doc. #'s 298, 737).  The case remained open until February 2010

while various adversary proceedings and appeals ran their course.

On November 26, 2001, while the 1996 Bankruptcy Case remained open (for

administrative purposes), Olick filed his fourth bankruptcy case, this time individually without

---

[4]     The 1996 Bankruptcy Case was filed while the second bankruptcy case was still pending and active.  The docket in the second case has seventy-nine (79) docket entries between the July 11, 1996 filing of the 1996 Bankruptcy Case and the September 22, 1997 dismissal of the second case.  I have no explanation for this.

[5]     For ease of reference, I will refer to Olick and his spouse in the singular throughout the balance of this Memorandum, even when the subject involves their joint filing.

[6]     These issues involved disputes over the proper distribution of the plan payments.  But there was no question that Olick and his spouse made all of the required chapter 13 plan payments.  (Bky. No. 96-22123, Doc. # 718).

4

his spouse. (Bky. No. 01-25353). The chapter 13 trustee promptly moved to dismiss the case. (Bky. No. 01-25353, Doc. # 7). After a hearing, and the submission of briefs by both sides, the case was dismissed by order entered April 3, 2002. (Bky. No. 01-25353, Doc. # 20).

Almost five (5) years later, on February 9, 2007, again while the 1996 Bankruptcy Case remained open, Olick filed his fifth bankruptcy case ("the 2007 Bankruptcy Case"). (See Bky. No. 07-10880). This was another individual filing by Olick. His chapter 13 plan was confirmed on January 22, 2008 and Olick received a discharge on March 6, 2012. During the 2007 Bankruptcy Case, Olick filed numerous adversary proceedings, including the present one.

Olick's last bankruptcy case was an individual chapter 7 filing on January 10, 2013 ("the 2013 Bankruptcy Case"). (See Bky. No. 13-10249). He received a discharge and the case was closed on June 7, 2013.

### C. The Origins of the Olick-House Dispute

Olick's dispute with House is rooted in the 1996 Bankruptcy Case. During that case, House represented Olick in two (2) capacities.

First, on Olick's motion, House was appointed in April 1997 to represent Olick in a proceeding in another forum – in effect, as special counsel to Olick in his capacity as chapter 13 debtor.[7] That other forum was a panel of the National Association of Securities Dealers, Inc., which was conducting an arbitration proceeding ("the NASD Arbitration") that Olick had

---

[7]        Paragraph 3 of the appointment order, dated April 29, 1997, authorized House to "provid[e] legal representation to the Debtors." (Bky. No. 96-22123, Doc. # 125).

commenced prepetition. (See Bky. No. 96-22123, Doc. # 125).[8]

Second, in August 1997, the scope of House's representation expanded when House entered his appearance, pro hac vice, as Olick's general bankruptcy counsel in the chapter 13 case. (Bky. No. 96-22123, Doc. # 214, August 28, 1997 Hearing Tr. at 6-9; see also Doc. #293, House's Motion to Withdraw as Debtor's Counsel ¶4).[9]

The House-Olick attorney client relationship was short-lived.  As will be detailed below in the recitation of the undisputed facts, House's role as general bankruptcy counsel terminated on March 11, 1999 and his role as special counsel in connection with the NASD Arbitration terminated on February 3, 1999.  All of Olick's claims in this adversary proceeding are rooted in the April 1997-March 1999 time frame.

### D.  Olick's Three (3) Prior Adversary Proceedings Against House

Olick has filed four (4) adversary complaints against House, three (3) in the 1996

---

[8]     The NASD compels its members to arbitrate disputes with investors under the NASD Code of Arbitration Procedure.  See, e.g., Vestax Sec. Corp. v. McWood, 280 F.3d 1078, 1081 (6th Cir. 2002); IFG Network Sec., Inc. v. King, 282 F. Supp. 2d 1344, 1350 (M.D. Fla. 2003), aff'd sub nom. Multi-Fin. Sec. Corp. v. King, 386 F.3d 1364 (11th Cir. 2004); Daugherty v. Washington Square Sec., Inc., 271 F. Supp. 2d 681, 688–89 (W.D. Pa. 2003).

        The NASD has been consolidated with another entity and is now called the Financial Industry Regulatory Authority ("FINRA").  See Thaning v. UBS/Paine Webber, 2008 WL 2024884, at *2 n.2 (N.D. Cal. May 8, 2008).

[9]     The transcript of the August 28, 1997 hearing confirms that the court did not "appoint" House as Olick's chapter 13 counsel, but merely authorized House to enter his appearance on their behalf in the bankruptcy case pro hac vice.  The distinction between appointment as counsel and a mere entry of appearance has some significance in this adversary proceeding and will be discussed further below.  See Part VI.D.2., infra.

Bankruptcy Case.  The current adversary proceeding was filed in 2010 and is related to Olick's

2007 Bankruptcy Case.  The claims asserted in the three (3) prior adversary proceedings and their

disposition are relevant and are summarized below.

### 1.  House I - Adv. No. 99-2058

On  March 22, 1999, a few weeks after the bankruptcy court terminated House's

representation (both as bankruptcy counsel and NASD Arbitration counsel), Olick filed his first

adversary complaint against House  ("House I").  In the House I complaint, Olick alleged

malpractice, breach of contract based on House's representation of Olick in the bankruptcy case

and the NASD Arbitration.  The initial complaint was dismissed, but Olick filed an amended

complaint on August 16, 1999.  The amended complaint was dismissed with prejudice on March

30, 2000. Olick did not appeal.

### 2.  House II - Adv. No. 02-2091

After the dismissal of House I, no adversary litigation between the parties occurred for

two (2) years. The NASD Arbitration remained pending and House did not participate in that

proceeding.  However, in the main bankruptcy case, Olick and House battled intensely (via

motion practice) over House's right to compensation from the bankruptcy estate.  On January 20,

2000, over Olick's objection, the bankruptcy court granted in part House's application for

compensation.  (Bky. No. 96-22123, Doc. # 333).   The entry of this order triggered an avalanche

of court filings by both Olick and House, including appeals to the district court.  (See, e.g., Bky.

No. 96-22123, Doc. #'s 334, 341, 351, 361, 365, 411, 415, 420, 447).[10]  This litigation was

ongoing when Olick commenced another adversary proceeding against House on March 28, 2002

("House II").

The House II complaint was comparatively narrow in nature.  Olick alleged that House

breached their agreement by failing to produce documents related to House's fee application in

the 1996 Bankruptcy Case.  On October 3, 2002, the bankruptcy court stayed  House II pending

the outcome of the appeals over House's compensation.  The stay lasted nearly seven (7) years.

House II was dismissed on January 12, 2009.  (Adv. No. 02-2091, Doc. # 10).  No appeal

followed.


### 3.  House III - Adv. No. 03-2054

On March 3, 2003, Olick filed his third adversary complaint against House alleging, inter

alia, malpractice, breach of contract and breach of fiduciary duty based on House's representation

of Olick in the bankruptcy case and the NASD Arbitration ("House III").  On April 8, 2003,

House moved to dismiss House III, but the bankruptcy court did not rule on it until January 28,

---

[10]     The docket in the 1996 Bankruptcy Case has over 200 entries between the entry of the
order allowing House's application for compensation in January 2000 and March 28, 2002.  Most of the
entries related to disputes between Olick and House, and the vast majority involved the specific dispute
over House's compensation.

After a remand from the district court, the bankruptcy court entered an order awarding
House compensation and reimbursement of expenses for the period from March 25, 1998 through
December 7, 1998. (See Bky. No. 96-22123, Doc. # 523). After further appeals, see In re Olick, 2005 WL
331534 (E.D. Pa. Feb. 10, 2005), the order ultimately was affirmed by the Third Circuit on June 4, 2008.
(See Bky. No. 96-22123, Doc. #'s 722, 723).

2010.  House III was dismissed for lack of jurisdiction.[11]


### E.  The Present Adversary Proceeding  –  House IV, Adv. No. 10-038

#### 1.  the bankruptcy court dismissal of the Complaint

On February 4, 2010, eight (8) days after the dismissal of House III, Olick filed another

complaint against House, initiating the present adversary proceeding ("House IV").

The adversary complaint in House IV is nearly identical to the one filed in House III.  In

the 38-page complaint, Olick asserted four (4) claims based on House's representation of Olick

during the bankruptcy case and the NASD Arbitration: (I) breach of contract; (II) fraud; (III)

negligence and malpractice; and (IV) breach of fiduciary duty.

House moved to dismiss House IV on April 1, 2010.  This court granted the motion on

June 28, 2011, reasoning that all of Olick's claims were precluded based on res judicata because:

> (1) the bankruptcy court's final order dated January 16, 2003 in Bky. No. 96-
> 22123, awarding House counsel fees (ultimately affirmed by the Third
> Circuit), barred further litigation of Counts I (breach of contract) and III
> (negligence/malpractice).
>
> (2) the March 30, 2000 order in House I, which denied Olick an opportunity to
> file a second amended complaint and granted House's motion to dismiss the
> amended complaint with prejudice, independently barred all counts in House
> IV.

---

[11]    The dismissal order noted that Olick had received a chapter 13 discharge and reasoned:

> in light of the completion of the administration of the main bankruptcy case, to
> the extent the claims raised in the above adversary proceeding have not been
> determined by final orders entered in this bankruptcy case or related adversary
> proceedings, the court lacks subject matter jurisdiction to determine those
> claims.

(Adv. No. 03-2054, Doc. # 31).

In re Olick, 2011 WL 2565665 (Bankr. E.D. Pa. June 28, 2011).

Olick timely appealed the dismissal to the district court. (Adv No. 10-038, Doc. # 32).

## 2. the district court remand

On December 18, 2012, the district court affirmed in part and reversed in part the

bankruptcy court order dismissing House IV.   In re Olick, 2012 WL 6592208 (E.D. Pa. Dec. 18,

2012).

The district court concluded that res judicata applied only to certain aspects of the

complaint.  The court also considered the statute of limitations issues as a potential alternative

ground for affirmance of dismissal of those claims that it determined were not precluded by res

judicata.  The court concluded that two (2) counts survived House's motion to dismiss: Count I

(breach of contract) and Count III (negligence/malpractice), but only insofar as those claims were

based on House's conduct in relation to some (but not all) of the claims Olick asserted during the

NASD Arbitration.[12]

---

[12]    The district court agreed that Olick's claims arising from House's representation as
general bankruptcy counsel were precluded.  The court disagreed with the application of res judicata to
Olick's claims arising out of House's role as special counsel, representing Olick in the NASD
Arbitration.  Accordingly, Counts I, III and IV, which contained allegations relating to House's failure to
represent Olick properly during the NASD Arbitration were not barred by House I.  However, Count IV
for breach of fiduciary duty was dismissed separately on the merits for failure to state a claim.  Thus,
Counts I and III survived the district court's statute of limitations scrutiny, but only with respect to some
– but not all  –  of the claims Olick had raised in the NASD Arbitration.  See n.28, infra.

### 3. the bankruptcy court proceedings after the district court remand

Following the district court's remand, the parties engaged in pre-trial maneuvers that delayed bringing the matter to a resolution for another three (3) years.[13]  Ultimately, on December 3, 2015, I issued "Pre-Trial Order #11," setting forth a briefing schedule for summary judgment motions. (Adv No. 10-038, Doc. # 255).   House responded by filing a timely motion for summary judgment on December 11, 2015. (Adv No. 10-038, Doc. # 259).  Olick's initial response was to file a motion to amend his complaint, which I denied forthwith. (Adv No. 10-038, Doc. #'s 263, 265).  Olick then represented he was having health issues warranting another, final extension of the briefing schedule.  I granted that request and issued Pretrial Order #12, which extended the deadline for responding to House's motion, (but which did not grant Olick additional time to file his own motion for summary judgment).  (Adv No. 10-038, Doc. # 264). Olick timely responded to House's motion on March 22, 2016.

The matter is finally ready for decision.

## III.  UNDISPUTED FACTS

### A.  Olick's Retention of House in 1997

On March 27, 1997, Olick filed a motion to appoint House "To Assist in the Adjudication of Debtor's Bankruptcy Estate Claims in NASD Arbitrations . . . ." (See Bky. No. 96-22123,

---

[13]     The delay caused by the parties was remarkable.  Within weeks following the return of the appeal from the district court to the bankruptcy court, Olick filed a motion for default judgment, which I denied. (Adv. No. 10-038, Doc. #'s 59, 61).  After that, both parties littered the docket with hundreds of filings involving multiple discovery disputes, requests for the imposition of sanctions and several requests to extend deadlines in the pretrial schedule.  In seeking these extensions, each party, at different times, based the request on the demands on their time in other cases they were litigating in this or other courts.  Resolution of this case never seemed to be the highest priority for either side.  I will not try to psychoanalyze the reasons for this.

Doc. # 107).   At the hearing on the motion, Olick referred to House as a specialist in securities

litigation.  (Bky. No. 96-22123, 4/10/97 Hrg. Tr. at 5, Doc. # 126).  Since House was not present

at the April 10, 1997 hearing on the motion, the court ordered Olick to produce several

documents, including a signed copy of the recent retainer agreement for the requested

appointment, (see Ex. House-2).[14]   Olick complied with the order and the bankruptcy court

granted Olick's motion on April 29, 1997, authorizing House to represent Olick in the NASD

Arbitration.  (See Ex. House-4; Bky. No. 96-22123, Doc. #'s 124 & 125; see also n.7, supra).

The court entered the order appointing House as special counsel,[15] despite expressing

uncertainty at the April 10, 1997 hearing as to the necessity of appointing special counsel to the

debtor.  The court's uncertainty on the subject is understandable and is discussed further in Part

VI.D.2., infra.

## B.  The NASD Arbitration

The NASD Arbitration involved two (2) complaints Olick filed against several

defendants relating to, among other things, various securities Olick sold to his clients between

1983 and 1992.  The complaints were docketed as Olick v. Dippel, NASD Case No. 94-50501

---

[14]     During the April 10, 1997 hearing, Olick revealed that House had already spent 300
hours on the NASD Arbitration and other matters.  This suggested that there was a retainer agreement
that preceded the 1997 special counsel appointment request.  The details of this prior arrangement and
representation are not relevant in the present matter.

[15]     In granting the application, the order stated that it deemed Olick's application as being
made under 11 U.S.C. § 327(e), that the "disinterestedness" test of §327(a) did not apply, that House was
not prohibited from providing legal representation to the Debtors because he held no interest adverse to
the estate merely because he held a pre-petition claim, and that he would be required to file applications
for fees and/or costs, subject to court approval. (See Ex. House-4).

("the Dippel Arbitration") and <u>Olick v. John Hancock Distributors, Inc.</u>, NASD Case No. 96-01247 ("the <u>Hancock</u> Arbitration").

The complaints against the "Hancock" and "Non-Hancock" respondents were subsequently consolidated.  In the complaints, Olick alleged that the respondents marketed certain securities and misrepresented them to be low/moderate risk investments, had safety of principal and were good for retirement accounts, when they were not. He also alleged that the defendants entered into certain compensation agreements whereby they would receive funds for investments made through Olick, which were then reinvested through one of the individual respondents, in exchange for their filing false complaints and spreading false allegations against Olick.  Olick asserted several causes of action including claims for fraud, libel, slander, defamation, conversion, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962.  (<u>See</u> Ex. House-22).

### C.  House's Entry of Appearance in the NASD Arbitration

On May 27, 1997, when House entered his appearance in the NASD Arbitration, he immediately faced certain procedural obstacles. (House Decl. ¶¶6-7).  There were record pleadings – "statements of claim" – that commenced each of the consolidated arbitrations. (House Decl. ¶7).  There also was a 279-paragraph "First Amended Complaint," which bore the caption and case number of the <u>Dippel</u> arbitration only, submitted and served by Olick without having first filed a motion for leave to amend. (House Decl. ¶12; Ex. House-5).[16]

---

[16]     House claims that Olick provided House with a copy of the Statement of Claims

(continued...)

13

House also learned that Olick submitted and served separate motions for leave to amend in both arbitration matters without having attached a proposed pleading. (House Decl. ¶12).[17]  On July 8, 1997, a pre-hearing conference was held during which the above motions of Olick were considered. (House Decl. ¶13).  Olick and House attended the conference, House appearing on Olick's behalf. (Id.).

The Panel set out its rulings from the July 8, 1997 hearing in a Memorandum of Rulings dated July 18, 1997. (See Ex. House-6).  In this memorandum, the Panel denied Olick's motion to file his "First Amended Complaint" in the Dippel arbitration, in light of Olick's oral request for leave to permit House to file an amended statements of claim. (See id.; House Decl. ¶15).  Olick's oral application for leave to permit House to file amended statements of claim in both matters also was denied without prejudice to Olick's right to file a motion for leave to amend; such motion required proposed amended pleadings. (Id.).  The Panel set an August 1, 1997 deadline for the filing of a motion for leave to amend.  House later requested an extension of time to file the motions for leave to file amended statements of claim in both matters. (See Ex. House-7; House Decl. ¶16).  Despite getting a one (1) week extension until August 8, 1997, House never filed the motion for leave to amend in either matter. (House Decl. ¶17).  The record

---

[16](...continued)
commencing the Hancock arbitration, but did not provide him with a copy of the statement of claims commencing the companion case, the Dippel arbitration.  (See House Decl. ¶¶7-8; Ex. House-18).  House also represents that he never received a copy of other filings Olick made on his own: a Motion to Add Additional Claims, or of a statement denominated "Additional Claims" from the Dippel arbitration. (Id.).

[17]        There was a prior ruling from a prehearing conference on February 11, 1997 providing, in relevant part, that Olick's "Motion to Add Additional Claims" was denied with leave to file a Motion to Amend the Statement of Claim by March 11, 1997. (See Ex. House-17).

14

is silent as to why House never filed the motion to amend, but House advised Olick shortly after

August 8, 1997 that he did not do so. (House Decl. ¶18; Ex. House-8).


### D.  The Deterioration of House-Olick Attorney-Client Relationship

Within nine (9) months of House's entry of appearance in the NASD Arbitration, Olick

became dissatisfied with House's representation.  House appeared equally dismayed by the

relationship.

Olick first sent a letter dated March 4, 1998 to the chapter 13 trustee, Fred Reigle ("the

Trustee") complaining about House's performance in the NASD Arbitration.  (See Ex. House-

16).  The letter was equivocal.  Olick stated his belief that House was not performing his duties

related to discovery, but also that he understood House's refusal to do so was because, among

other reasons, House did not have the storage, did not wish to incur the expenses associated with

storage and, most significantly, did not believe that his fees and expenses would be approved by

the bankruptcy court. (Id.).  Olick requested that the Trustee contact House to "encourage him to

do his duties with due care" or, alternatively, abandon the representation so that Olick might

pursue it himself. (Id.).

Olick next faxed a letter to House dated March 20, 1998 confirming a phone discussion

the two had that afternoon concerning the dissolution of their attorney-client relationship.

(See Ex. House-8).  Specifically, Olick stated his understanding that:

- House intended to withdraw from the NASD Arbitration

- House no longer intended to work on the bankruptcy case or appear at a

hearing scheduled for March 24, 1998 because of his belief that his fees
applications would not be approved.

- House would allow Olick to retrieve his files from House's office at 11:00 am
on March 26, 1998.

(Id.).

In the same letter, Olick added a somewhat mixed message.  He stated that he believed

that House could still provide him with "good representation," but that he would "reluctantly"

file a motion to discharge counsel.  Olick then stated his belief that he lacked authority to

discharge House as the Trustee's special counsel.[18]  Finally, he complained about House's failure

to "properly represent" him[19] and asserted that House's withdrawal from the NASD Arbitration

"at the last possible minute" caused him "serious and irreparable harm."   (Id.).

Olick followed up on the March 20, 1998 letter to House by filing a motion to discharge

House as bankruptcy counsel ("the Olick March 1998 Motion to Discharge Counsel") (Bky. No.

96-22123, Doc. # 256).  That motion is dated March 23, 1998, but for some reason was not

docketed until April 10, 1998.

In the Olick March 1998 Motion to Discharge Counsel, Olick referred to inadequate

representation in both the bankruptcy court and the NASD Arbitration.  The motion requested

that House be "DISCHARGED FOR CAUSE as Debtors' Counsel and that the Debtors be

_____

[18]      House was not appointed as special counsel to the Trustee.  He was appointed as special
counsel to the Debtor.  See n.7 supra.  Olick is not alone in confusing the nature of the appointment.
House and the district court have made the same mistake.  See nn.21, 33, infra.

[19]      Olick referred to House's failure to conduct discovery and to file the amended complaint,
which he believed precluded him from seeking damages attributable to the NASD respondents' conduct.
(Ex. House -8).

allowed to proceed on a pro se basis."  (Bky. No. 96-22123, Doc. # 256) (caps in original). <u>The</u>

<u>bankruptcy court never ruled on this motion.</u>

Meanwhile, the NASD Arbitration remained scheduled for a hearing on May 21, 1998.

The Panel convened, but House did not appear.  Olick appeared by himself and requested an

adjournment.  (<u>See</u> Ex. House-11; House Decl. ¶20).[20]

A few days later, on May 26, 1998, House filed a motion to withdraw as special counsel

in the NASD Arbitration.[21]  ("the House May 1998 Motion to Withdraw") (See Ex. House-10;

House Decl. ¶¶19, 2; Bky. No. 96-22123, Doc. # 370).[22]   The bankruptcy court also never ruled

---

[20]     On May 20, 1998, the eve of the first scheduled hearing on the merits in the
NASD Arbitration, House advised Olick by phone that he was filing a motion to withdraw and faxed him
an unsigned and undated draft of the motion for his review. (House Decl. ¶19; Exs. House-9 & House-
10).

[21]     In the ongoing lack of clarity regarding the nature of House's appointment as special
counsel, House referred to himself as "special counsel to the Trustee" appointed "to provide legal
representation to" Olick in the May 1998 Motion to Withdraw.  On its face, the statement seems self-
contradictory.

[22]     In the House May 1998 Motion to Withdraw, House stated that:

> The relationship between Movant and Debtor has been strained for more than six
> months.  Movant and Debtor have disagreed repeatedly over fundamental
> matters relating to the engagement.  These have centered on issues relating to the
> substance of the engagement and the manner in which the engagement would be
> carried out. The disagreements have been such as to leave Movant either in a
> position in which in his professional judgment, he could not act in a manner
> consistent with the obligations he owes to the tribunals in which he appears, or
> in a position in which he could not, in his professional opinion, justify the costs
> of what he was being required to undertake in terms of the potential benefits to
> the Debtor's estate.

(Bky. No. 96-22123, Doc. # 370).

House further claimed that

> [i]t is apparent to the Movant, and reflected in Debtor's recent attempt to have
>                                                                    (continued...)

on the House May 1998 Motion to Withdraw.

On June 12, 1998, the NASD Panel issued an Interim Order ("the Interim Panel Order"),

adjourning the proceedings sine die pending the bankruptcy court's determinations whether

House would be permitted to withdraw as counsel and whether Olick would be permitted to

proceed pro se.  (See Ex. House-11).[23]

On June 30, 1998, the NASD Panel Chair, Diane Ciccone, wrote a letter dated to the

bankruptcy court, inquiring about the disposition of House's May Motion to Withdraw.  (Ex.

---

[22](...continued)
> Movant discharged as counsel, that Movant has all but lost any confidence and
> trust he had in the advice and judgment of Movant.
>                                         . . .
>
> No benefit will be served the estate by requiring Movant to continue as special
> counsel to the Trustee.  It was, and remains, the firm conviction of Movant that
> there is a significant likelihood of benefit to the Debtor's estate in the pursuit of
> the arbitration for which Movant was appointed counsel.  Debtor and Movant
> have disagreed so fundamentally over that matter, and their relationship has
> deteriorated so far, that any such benefit is unlikely to be realized with Movant
> as counsel.

Id.

[23]      The Interim Panel Order also sanctioned House over $8,300.00 for willful and
intentional disregard for the orders of the panel and the NASD rules and regulations.

The Interim Panel Order stated:

> [I]n light of [its] determination that Special Counsel William House has
> continuously failed to comply with every order of this panel and the Rules of the
> NASD Regulation Code of Arbitration Procedure and the panel further finds that
> not only did Special Counsel House fail to appear at this hearing, he failed to
> notify the panel, the NASD Regulation and/or counsel for the Respondents of his
> intention not to appear, and so pursuant to Rule 10324 of the NASD Regulation
> Code of Arbitration Procedure, Special Counsel shall pay . . . sanctions by June
> 20, 1998 for his wilful and intentional disregard for the orders of this panel and
> the NASD Regulation's rule and regulations   .   .   .   .

(Ex. House-11)

House-19).  The letter included criticism of House's conduct in the NASD Arbitration.[24]

Over the next five (5) months, for reasons not in the record, the bankruptcy court took no action on either the Olick March 1998 Motion to Discharge Counsel or the House May 1998 Motion to Withdraw and no NASD Arbitration sessions were held.

On December 7, 1998, Olick sent a letter to the Clerk of the bankruptcy court advising the court that he had discharged House.  Olick stated:

> Dear Sir:
>
> This note is to inform you that Mr. House has been discharged as counsel.  All future correspondance [sic] should be directed to the Debtors who will be proceeding pro se.

(See Bky. No. 96-22123, Doc. # 281).  This letter triggered a flurry of new bankruptcy court filings and orders.

First, on January 21, 1999, House filed another motion to withdraw as counsel – this time as bankruptcy counsel ("the House January 1999 Motion to Withdraw") (Bky. No. 96-22123, Doc. # 293).  In this motion, House referenced a letter dated December 7, 1998 in which Olick advised him that Olick was discharging House as bankruptcy counsel.  House also stated, in

---

[24]    Ciccone stated:

> We believe that Mr. House's conduct has caused all the parties, their counsel, the Panel and the NASD to incur needless expense and unnecessary inconvenience.  We also believe that his conduct has substantially delayed the resolution of the matter before us.  The Panel has issued an order requiring Mr. House to reimburse respondents, their counsel and the NASD for the costs and expenses they incurred in appearing at the hearing on May 21, 1998 . . . and is contemplating filing charges with the appropriate disciplinary authorities.

(Ex. House-11).

terms almost identical to the House May 1998 Motion to Withdraw, that the attorney-client

relationship had broken down and that he could not continue the representation in a manner

consistent with his professional judgment and his duties to the tribunals.  See n.22, supra.  The

motion also referenced the pending NASD Arbitration and pointed out that House had already

filed the House May 1998 Motion to Withdraw with respect to that aspect of the representation.[25]

On February 1, 1999, while the House January 1999 Motion to Withdraw was pending,

Olick filed a motion seeking permission to proceed pro se in the NASD Arbitration ("the Olick

February 1999 Pro Se Motion").  (See Ex. House-13; Bky. No. 96-22123, Doc. # 307).  Olick's

motion alleged that the NASD Arbitration had "languished" because it could not proceed unless

the bankruptcy estate appeared through "either counsel or the Debtors."  (Id. ¶4).  The Olick

February 1999 Pro Se Motion also pointed out that the court had yet to rule on either the Olick

March 1998 Motion to Discharge or the House May 1998 Motion to Withdraw.

The bankruptcy court granted the two (2) 1999 motions concerning the Olick-House

relationship in reverse chronological order.  On February 3, 1999, the court granted the Olick

February 1999 Pro Se Motion, two (2) days after it was filed and authorized Olick to proceed pro

se in the NASD Arbitration. (See Ex. House-20; Bky. No. 96-22123, Doc. # 309).  On March 11,

1999, the court granted the House January 1999 Motion to Withdraw, withdrawing House's

---

[25]      The House January 1999 Motion to Withdraw suggests that House viewed the January
1999 Motion as distinct from the May 1998 Motion, the latter motion pertaining to representation of the
Debtors in the bankruptcy case and the former pertaining only to the representation of the Debtor and/or
the Trustee in the NASD Arbitration.  Or, perhaps the later motion was intended to incorporate the earlier
motion in an attempt to obtain a ruling on it.

appearance as Olick's general bankruptcy counsel.  (See Bky. No. 96-22123, Doc. # 324).[26]

## E.  The Conclusion of the NASD Arbitration

On March 30, 2000, the NASD Arbitration proceedings resumed.  Over the next fourteen

(14) months, the Panel conducted sixty-eight (68) hearing sessions, the last one on May 9, 2001.

House did not appear at any of the sessions.  (House Decl. ¶25).

The Panel issued an award on July 13, 2001 and then, on July 20, 2001, a "Corrected

Award."  The Panel found that Olick was entitled to a total of over $90,000.00 from the various

defendants and the expungement of all reference to certain customer complaints.[27]  Olick's claim

for punitive damages was denied in its entirety and all parties were ordered to bear their

respective fees, costs and expenses.  (See Ex. House-1).

The forum fees amounted to $72,000.00 because the consolidated proceedings required a

total of seventy-two (72) sessions to adjudicate, which included three (3) pre-hearing sessions.

Sixty-nine (69) of the seventy-two (72) sessions were held after the bankruptcy court granted

---

[26]     The Order provided:

> . . . upon consideration of the motion by William C. House, P.C. for an order **permitting it to withdraw as counsel to debtors Thomas W. And Kathryn Olick in the instant bankruptcy**, it is ORDERED that the motion is GRANTED and that William C. House, P.C. is hereby relieved and discharged of all duties as counsel to the debtors.

(Bky. No. 96-22123, Doc. # 324) (emphasis added).


[27]     Olick had requested $583,808.16 in compensatory damages and $1,751,424.48 in punitive damages, the costs of prosecution and the expungement of the related customer complaints.

Olick's February 1999 <u>Pro Se</u> Motion.  The Panel stated that the consolidated proceeding was "as lengthy as it was, due to the conduct of the parties," and allocated the fees among the parties. (<u>Id.</u>).  The panel required Olick to pay $28,800.00 in fees.  (<u>Id.</u>).

## IV.  SUMMARY JUDGMENT STANDARD

The legal standard for the entry of summary judgment under Fed. R. Civ. P. 56, incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056,  is well established.

Summary judgment is appropriate only when, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. <u>E.g.</u>, <u>Tri-M Group, LLC v. Sharp</u>, 638 F.3d 406, 415 (3d Cir. 2011); <u>In re Bath</u>, 442 B.R. 377, 387 (Bankr. E.D. Pa. 2010).  In other words, summary judgment may be entered if there are no disputed issues of material fact and the undisputed facts would require a directed verdict in favor of the movant.  <u>See</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993).

When deciding a summary judgment motion, the court's role is not to weigh the evidence, but to determine whether there is a disputed, material fact for resolution at trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  A genuine issue of material fact is one in which sufficient evidence exists that would permit a reasonable fact finder to return a verdict for the non-moving party.  <u>Id.</u> at 248.

If the moving party does not bear the burden of proof at trial, then the movant must

demonstrate the absence of a disputed issue of material fact, and an entitlement to judgment in its

favor may be established in either of two (2) ways.

First, if the movant presents evidence establishing that the undisputed facts negate at least

one (1) element of the respondent's claim, the movant is entitled to summary judgment.  In re

Polichuk, 506 B.R. 405, 422 (Bankr. E.D. Pa. 2014) (citing Quaker State Minit-Lube, Inc. v.

Fireman's Fund Ins. Co., 868 F. Supp. 1278, 1287 n.5 (D. Utah 1994)).

Second, the movant may obtain summary judgment by demonstrating that the responding

party lacks evidence to support an essential element of its claim.  See, e.g., Orson, Inc. v.

Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Chipollini v. Spencer Gifts, Inc., 814

F.2d 893, 896 (3d Cir. 1987).

These burden of proof principles apply to House's Motion for Summary Judgment.

House is the moving party and, as the defendant, he does not bear the burden of proof at trial.


## V.   HOUSE IS ENTITLED TO SUMMARY JUDGMENT
## BECAUSE OLICK HAS NOT MET HIS EVIDENTIARY BURDEN

Following the district court remand, two (2) claims remain: (1) breach of contract and (2)

negligence/malpractice.  Both surviving claims are based solely on House's representation in

connection with Olick's NASD claims against the "Non-Hancock" respondents.[28]

---

[28]    The district court held that res judicata did not bar Olick's claims against the NASD
respondents.  However, it held that the claims against the "Hancock" respondents were barred by the
expiration of the statute of limitations and affirmed the dismissal of the complaint insofar as it alleged
that House committed legal malpractice in connection that aspect of the NASD Arbitration.

(continued...)

23

Summary judgment will be entered in House's favor on the remanded claims because Olick has not met his evidentiary burden in response to House's motion for summary judgment. To meet that burden, Olick had to show the existence of competent evidence supporting each element of the claims. See Part IV, supra. He has not done so. Indeed, Olick has not come forward with any evidence to support certain elements of his claims. As a result, House is entitled to summary judgment.

## A. Elements of Olick's Contract and Tort Claims

Olick's complaint alleges that House committed legal malpractice and employs both breach of contract and negligence legal theories.

In Pennsylvania, legal malpractice actions may sound in both tort and contract; a plaintiff may bring both at the same time. ASTech Int'l, LLC v. Husick, 676 F. Supp. 2d 389, 400 (E.D. Pa 2009); Wachovia Bank, N.A. v. Ferretti, 935 A.2d 565, 570-71 (Pa. Super. Ct. 2007).

Under Pennsylvania law, to state a legal malpractice claim under a breach of contract theory, the plaintiff bears the burden of proving:

> (1) the existence of a contract, including its essential terms;

> (2) a breach of a duty imposed by the contract and

> (3) resultant damages.

---

[28](...continued)
The district court then held that it appeared that the statute of limitations had not expired against the respondents known as the "Non-Hancock" respondents and remanded the proceeding. The statute of limitations issue as to the Non-Hancock respondents is reexamined and discussed more fully in Part VI., infra.

ASTech Int'l, 676 F. Supp. 2d at 400; <u>Meyers v. Sudfeld</u>, 2006 WL 401855, at *4 (E.D. Pa. Feb. 21, 2006).

To state a claim for legal malpractice under a negligence theory, the plaintiff bears the burden of proving:

> (1) the employment of the attorney or other basis for duty;
>
> (2) the failure of the attorney to exercise ordinary skill and knowledge; and
>
> (3) that such negligence was the proximate cause of damage to the plaintiff.

<u>Bailey v. Tucker</u>, 533 Pa. 237, 621 A.2d 108, 112 (1993); <u>Rizzo v. Haines,</u> 555 A.2d 58, 65 (1989); ASTech Int'l, 676 F. Supp. 2d at 400; Ferretti, 935 A.2d at 571.

To satisfy the proximate cause element, the plaintiff must establish that he had a viable cause of action in the underlying case and that the attorney he hired was negligent in prosecuting or defending that underlying case (often referred to as proving a "case within a case"). <u>Kituskie v. Corbman</u>, 714 A.2d 1027, 1031 (Pa. 1998); <u>Poole v. W.C.A.B. (Warehouse Club Inc.)</u>, 570 Pa. 495, 499-500, 810 A.2d 1182, 1184 (2002); <u>Myers v. Robert Lewis Seigle, P.C.</u>, 2000 PA Super 136, ¶9, 751 A.2d 1182, 1185 (Pa. Super. Ct. 2000).

The Supreme Court of Pennsylvania has described this "case within a case" element as requiring that the plaintiff prove **<u>first</u>** that he would have won the underlying case in which the alleged malpractice occurred.  If the plaintiff can do so, the plaintiff must then prove that the defendant attorney's negligence was the proximate cause of the loss. <u>Kituskie</u>, 714 A.2d at

1031.[29]

Another key element of legal malpractice – shared by both the contract and tort legal theories – is the requirement there be an "actual loss." To establish this element, more than the existence of nominal damages, speculative harm or the threat of future harm must be proven. See ASTech Int'l, LLC, 676 F. Supp. 2d at 400; Kituskie, 714 A.2d at 1029-31; Rizzo, 555 A.2d at 68.[30] Actual losses are measured by the judgment the plaintiff lost in the underlying action. Kituskie, 714 A.2d at 1030. The party held responsible for the lost judgment is the attorney who negligently handled the underlying action. Id.

### B. There Is No Evidence to Prove the "Case Within the Case" or Actual Loss

Because Olick prevailed, in part, in the NASD Arbitration, this case differs somewhat from a legal malpractice case in which the malpractice plaintiff lost the prior action. Of course,

---

[29]    An unfavorable result in the underlying litigation does not create a presumption of negligence in a legal malpractice action :

> There is no presumption that an attorney has been guilty of a want of care, arising merely from a bad result. An attorney's "informed judgment, even if subsequently proven to be erroneous, is not negligence." Ultimately, summary judgment must be granted "if the evidence of negligence is too speculative to establish any material issue of fact."

Redding v. Estate of Sugarman, 2012 WL 1555454, at *1 (E.D. Pa. May 3, 2012), aff'd, 535 Fed.App'x 99 (3d Cir. 2013) (internal citations omitted).

[30]    Damages are considered remote or speculative if there is uncertainty concerning the existence of damages, rather than difficulty in their precise calculation. Kituskie, 714 A.2d at 1031.

the outcome of the NASD Arbitration was not as lucrative as Olick hoped (Olick requested
$583,808.16 in compensatory damages and $1,751,424.48 in punitive damages).  Olick calls the
outcome a "loss" and attributes the loss and the accompanying session fees the Panel assessed
against him to House's inadequate representation.[31]  Thus, in this case, the elements of
"proximate cause" (i.e., the need to prove "the case within the case") and actual damages bleed
into each other.

Olick's claims fail because he has not produced any evidence that would establish either
the "case within the case" or actual loss.

Olick has offered virtually no competent evidence.  His submission on summary
judgment amounts to little more than a repetition of the conclusory allegations stated in the
complaint and pretrial statement, accompanied by other unsupported conclusory allegations in his
brief.  There is no evidence showing any connection between the disappointing outcome (to
Olick) of the NASD Arbitration and the alleged shortcomings in House's representation.

The inadequacy of Olick's evidentiary presentation is illustrated by his failure to file a
certificate of merit pursuant to Pa. R. Civ. P. 1042.3(a).  Rule 1042.3(a) provides in relevant part:

---

[31]     Olick bases both legal claims on the same underlying facts, alleging that House breached
the retainer agreement, as well as his duty, and thus was negligent, because he failed to file a motion to
amend, conduct discovery and appear at the arbitration hearings.

Olick argued in his brief that House's conduct caused him damages of $180,000.00,
despite his receipt of an award of over $90,000.00. He also averred in his complaint that "the panel
imposed an $18,000.00 fee upon Olick for House's aforementioned negligence and misconduct . . ." (See
Olick's Br. at 29; Compl. ¶33).  The reference to an $18,000.00 fee must be a typographical error as the
panel imposed a $28,800.00 fee to Olick as his portion of the total costs of $72,000.00.  Nothing in the
panel decision attributed the fee to House's conduct.

In any action based upon an allegation that a professional deviated from an acceptable professional standard, the attorney for the plaintiff, **or the plaintiff if not represented**, **shall file with the complaint or within sixty days after** the filing of the complaint, **a certificate of merit** signed by the attorney or party that either

(1) **an appropriate licensed professional has supplied a written statement** that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

(emphasis added).

Rule 1042.3(a) is treated as substantive state law by federal courts sitting in diversity.

E.g., Koukos v. Chester Cty., 2017 WL 549150, at *3 (E.D. Pa. Feb. 7, 2017); US Airways, Inc. v. Elliot Equip. Co., 2007 WL 3085864, at *2 (E.D. Pa. Oct. 22, 2007); Scaramuzza v. Sciolla, 345 F. Supp. 2d 508, 509-10 (E.D. Pa. 2004); see also Chamberlain v. Giampapa, 210 F.3d 154, 158-61 (3d Cir. 2000) (applying New Jersey law).   It similarly must be substantive law when a state law claim is heard as a "related proceeding" in the bankruptcy court.

The case law establishes that failure to file a certificate of merit is treated as the failure to plead an essential element of the plaintiff's claim and results in dismissal of the complaint.  At the summary judgment stage, the absence of a certificate of merit strongly suggests that Olick lacks evidence establishing House's conduct "fell outside acceptable professional standards" and caused Olick harm.  Pa. R. Civ. P. 1042.3(a)(1).

28

Another way of expressing the same point would be to say that Olick's claims against

House cannot succeed without expert testimony.  While Pennsylvania law does not mandate

expert testimony to support every legal malpractice claim, in some cases expert testimony is a

necessity.

In Storm v. Golden, 538 A.2d 61 (Pa. Super. Ct. 1988), the court described the

considerations affecting the determination whether expert testimony is needed:

> Legal malpractice claims run a wide gamut of circumstances from clear cut claims
> of a breach of an attorney's duty for allowing the statute of limitations to run
> against the former client's cause of action to the complex determination required
> of a claim of breach of duty involving the attorney's choice of trial tactics in which
> a layperson's judgment obviously requires guidance. .   .   .   Generally, the
> determination of whether expert evidence is required or not will turn on whether
> the issue of negligence in the particular case is one which is sufficiently clear so
> as to be determinable by laypersons or concluded as a matter of law, or whether
> the alleged breach of duty involves too complex a legal issue so as to warrant
> explication by expert evidence.

Storm, 538 A.2d at 64; see also Chandler v. Cook, 438 Pa. 447, 451 n.* (Pa. 1970) ("The only

exception to the requirement that expert testimony must be produced is where the matter under

investigation is so simple, and the lack of skill or want of care so obvious, as to be within the

range of the ordinary experience and comprehension of even nonprofessional persons"); Burns v.

City of Philadelphia, 504 A.2d 1321, 1325 (Pa. Super. Ct. 1986) (same); Int'l Land Acquisitions,

Inc. v. Fausto, 39 Fed. App'x 751, 757 (3d Cir. 2002) (nonprecedential) (same); Beach Tree Run,

Inc. v. Kates, 2000 WL 1269839, at *8 (E.D. Pa. Sept. 7, 2000).

Olick's claims fall within the category of those requiring expert testimony.  This is not

simply a case of missing a statute of limitations or some other straightforward, obvious

professional misstep.   Rather, Olick alleges that House's failure to raise issues and conduct

discovery fell below professional standards.  Olick was required to establish that the underlying

claims that did not succeed at the NASD Arbitration were meritorious and to show that House's

inadequate representation caused them to fail.  These are precisely the type of complex issues

that necessitate the use of expert testimony in a legal malpractice case.  Olick has not come

forward with expert testimony on these issues.  Indeed, he has produced no evidence at all to

support these claims.

Nor is there any evidence suggesting that the session fees imposed on Olick were

attributable to House's absence.  The only evidence in the record is the Panel's general statement

that the proceeding was lengthy "due to the conduct of the parties."  (See Ex. House-1; see also

n.31, supra).   The Panel made no reference to House.  If anything, based on the entirety of the

record, the only reasonable inference to be drawn is that the undue length of the arbitration had

nothing to do with House in that sixty-nine (69) sessions of its seventy-two (72) sessions were

held after House ceased representing Olick.  The only plausible inference is that the undue length

of the proceeding was caused either by Olick's self-representation or the conduct of the

respondents (or both).  It is impossible to attribute the high session fees to House.

"Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary

judgment." Rodenbaugh v. Santiago, 2017 WL 590269, at *4 (E.D. Pa. Feb. 14, 2017) (citing

Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999)).  That is all Olick

has presented.  The lack of evidence is fatal to his claims.

Consequently, House will be granted summary judgment on all counts.

## VI.  ALTERNATIVELY, OLICK'S CLAIMS ARE TIME BARRED

### A.  Introduction

In many cases, it is sufficient to base the grant of summary judgment on the grounds

stated above in Part V.  But this is an unusual case.  Due to the inordinate length of this dispute,

it is appropriate for this court to make every effort to bring the matter to a conclusion.  As a

result, I will set forth an alternative ground for granting House summary judgment.  By doing so,

I will provide the district court with a more complete analysis of the case and minimize the

potential for piecemeal litigation and multiple appeals.

As explained below, the record establishes conclusively that the House-Olick attorney-

client relationship with respect to the NASD Arbitration terminated earlier than the date

employed by the district court when it determined preliminarily that the statute of limitations had

not expired on Olick's claims against House relating to his conduct of Olick's claims against the

Non-Hancock defendants in the NASD Arbitration. While I do not find that particular factual

distinction, by itself, establishes that the statute of limitations expired before Olick commenced

this adversary proceeding, I do conclude, based on binding Third Circuit precedent not

considered by the district court, that the remanded claims are time-barred as a matter of law.

### B.  It Is Appropriate to Revisit the Statute of Limitations Issue

In its opinion remanding this case in 2012, the district court determined that the Non-

Hancock related claims in Counts I and III did not appear to be time-barred.  Significantly,

however, the district court acknowledged that its preliminary determination of timeliness might

be altered with a more complete record:

> **Upon further discovery**, the bankruptcy court may determine whether or not Olick's allegations of House's bad acts regarding the other NASD defendants are barred by the statute of limitations.

Olick, 2012 WL 6592208, at *8 (emphasis added).

At this later stage of the proceeding, with the benefit of a more fulsome record and after consideration of binding Third Circuit precedent, I am equipped to determine when the attorney-client relationship pertaining to House's representation of Olick in the NASD Arbitration terminated and accordingly, the date the limitations period may have began to run.[32]  I now conclude that the statue of limitations on the claims asserted in Counts I and III expired before Olick filed the complaint initiating this adversary proceeding.

## C.  The District Court's Statute of Limitations Analysis

In analyzing the statute of limitations issue, it is helpful to begin with the district court's discussion of the issue.  That discussion focused on the date the limitations period began to run and the effect on the running of the limitations period of the filing of <u>House III</u> in 2003 and <u>House III</u>'s pendency until its dismissal in 2010.

---

[32]    In making its decision on the appeal from this court's order dismissing the complaint, the district court had only the pleadings to consider and was obliged, of course, to accept as true all allegations in the complaint and all reasonable inferences that could be drawn therefrom.  E.g., <u>Hartig Drug Co. Inc. v. Senju Pharm. Co.</u>, 836 F.3d 261, 268 (3d Cir. 2016).

The pleadings referred only to Olick's December 7, 1997 letter terminating House as bankruptcy counsel and the House January 1999 Motion to Withdraw, which was granted on March 11, 1999.  Giving the plaintiff the benefit of all reasonable inferences that could be drawn from the documents, the district court concluded that the March 11, 1999 order terminated House's status only as general bankruptcy counsel, leaving intact his status as Olick's special counsel.  Nothing else was presented to the district court to suggest that House's status as special counsel may have terminated prior to the conclusion of the NASD Arbitration.

In evaluating the start date of the limitations period, the district court emphasized the duality of House's representation: (1) as general bankruptcy counsel and (2) as special counsel.[33] The court interpreted the bankruptcy court's March 11, 1999 order granting the House January 1999 Motion to Withdraw as terminating House's representation **only as Olick's bankruptcy counsel**, and not as special counsel.  Unaware of the entry of the February 3, 1999 order granting the Olick February 1999 Pro Se Motion and believing that the only relevant bankruptcy court order had terminated House only as Olick's bankruptcy counsel and not as special counsel, the district court treated House as continuing as Olick's NASD Arbitration counsel through July 20, 2001, the date the NASD Arbitration Panel issued its amended decision.  See Olick, 2012 WL 6592208, at *8.

Using the later July 20, 2001 date for commencement of the limitations period  – a date less than two (2) years before the commencement of House III  –  the district court applied Pennsylvania savings statute, 42 Pa. C.S. §5535(a).

Section 5535(a) provides, in pertinent part, that if a timely filed action is terminated for a reason other than a voluntary nonsuit, a discontinuance, a dismissal for neglect to prosecute the action or proceeding, or a final judgment upon the merits, the party may refile the lawsuit "within one year after the termination" of the original action.

House IV was filed eight (8) days after the non-merits dismissal of House III.   Thus, if the Pennsylvania savings statute applies, the timeliness of House IV is dependent on the

---

[33]      Like the parties throughout these proceedings, the district court referred to House as having been appointed as special counsel to the Trustee, but also as special counsel to the Debtor.  See Olick, 2012 WL 6592208, at *8; see also In re Olick, 2002 WL 1739667, at *1-3 (E.D. Pa. July 16, 2002).

timeliness of House III.  House III was filed on March 3, 2003, **less than two (2) years after**

**July 20, 2001, the date the district court determined that the limitations period began to**

**run**.  Thus, the district court reasoned that if House III was timely filed, so too was House IV

(assuming that the Pennsylvania savings statute applies) because the shortest applicable statute of

limitations is two (2) years.  See 42 Pa. C.S. §§5524, 525(a)(8) (providing a two (2) year statute

of limitations for tort claims, including legal malpractice claims, and a four (4) year statute of

limitations for breach of contract claims).

The district court invoked the Pennsylvania savings statute and found that, facially,

counts I and III of House IV were filed timely as to the Non-Hancock claims.  See Olick, 2012

WL 6592208, at *7.


### D.  The Attorney-Client Relationship Terminated With Respect to the NASD Arbitration on February 3, 1999, Not on July 20, 2001

As explained above in Part VI.C., the district court employed July 20, 2001, the end date

of the NASD Arbitration, as the commencement date for the statute of limitations because it

perceived no bankruptcy court order terminating the House-Olick attorney-client relationship

prior to that date.  Based on applicable Pennsylvania and federal bankruptcy law and the

summary judgment record, I conclude that NASD attorney-client relationship terminated earlier,

no later than February 3, 1999.

### 1. Pennsylvania law

Under Pennsylvania law, a client has the absolute right to terminate unilaterally the attorney-client relationship, with or without cause, regardless of any contractual relationship between the two parties. See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258-59 (Pa. 2016); Novinger v. E.I. DuPont De Neours & Co., 809 F.2d 212, 218 (3d Cir. 1987); In re Sacerdote, 74 B.R 487, 489 (E.D. Pa. 1987); Cherry v. Zucker, 2002 WL 31426203 (Pa. Com. Pl. 2002), aff'd, 817 A.2d 1172 (Pa. Super. Ct. 2002). To do so, a client "need not provide written notice to the attorney; mere notice of an act demonstrating the clear intention of the client to dismiss his counsel is sufficient." Sacerdote, 74 B.R at 489.

### 2. the Bankruptcy Code

The principles of Pennsylvania law governing the attorney-client relationship were not modified in this case by applicable bankruptcy law with respect to House's representation of Olick in the NASD Arbitration. The district court's ruling, at the motion to dismiss stage, was based, in part, on the premise that bankruptcy law principles overrode state law. Specifically, the district court presumed the bankruptcy court's appointment of House as special counsel trumped Olick's unilateral right, under applicable nonbankruptcy law, to terminate the attorney-client relationship. In the absence of a bankruptcy court order permitting House to withdraw as special counsel, the district court concluded that he remained Olick's special counsel until the end of the NASD Arbitration. However, throughout this epic war between Olick and House, the parties and the courts have overlooked the significance of Olick's status as a chapter 13 debtor.

35

Proper consideration of the relationship between a chapter 13 debtor and his or her non-bankruptcy counsel leads to the conclusion that termination of the Olick-House special counsel relationship was not dependent upon the entry of a bankruptcy court order.

Unlike chapter 11 debtors, chapter 13 debtors are not trustees of the bankruptcy estate. In chapter 11, the debtor-in-possession serves as the trustee and no separate trustee is appointed. See 11 U.S.C. §1107(a) (debtor in possession has, with very limited exceptions, "all the rights" of a chapter 11 trustee); 11 U.S.C. §1104 (trustee is appointed only after notice and hearing and only for "cause" or if such appointment is in the best interests of creditors). By comparison, in a chapter 13 case, a separate trustee is appointed and the chapter 13 debtor's authority to exercise trustee powers is circumscribed  See 11 U.S.C. §1303(a) (chapter 13 debtor may exercise only certain trustee powers under §363); see also 11 U.S.C. §522(g), (h) (in prescribed circumstances, the debtor may exercise trustee avoidance powers). Simply put, in a chapter 13 case, the debtor is not the trustee.

The distinction between the debtor and the trustee in a chapter 13 case has consequences in connection with the employment of professionals. 11 U.S.C. §327 mandates that "the trustee" obtain court approval before employing professionals. There is no Code provision imposing the same obligation on a chapter 13 debtor. As a result, a chapter 13 debtor does not need bankruptcy court approval to employ counsel.[34] Indeed, in every-day practice in the bankruptcy

---

[34]     The distinction between the trustee and the debtor in connection to their respective relationships to their counsel is expressed in the Code's compensation provision, 11 U.S.C. §330.

Generally, §330(a)(1) authorizes the payment of compensation from the bankruptcy estate only to professionals "employed under section 327 or 1103." This provision, by itself, would exclude a chapter 13 debtor's counsel from receiving compensation from the bankruptcy estate (typically,

(continued...)

courts, no one expects chapter 13 debtors to request court appointment of their bankruptcy

counsel and debtors never do so.

In 1997, when Olick requested House's appointment as special counsel, the bankruptcy

court was well aware of these principles.  At the hearing on Olick's motion, the bankruptcy judge

observed that he had never approved a pro se chapter 13 debtor's motion to appoint special

counsel in another forum in his twenty-two (22) years on the bench.  (Bky. No. 96-22123,

4/10/97 Hrg. Tr. at 17, Doc. # 126).

In light of these legal principles and the bankruptcy court's expression of its own

misgivings about the need to appoint House as special counsel, it is difficult to understand why

the court did so.  Twenty (20) years later, there is no way to determine with certainty the rationale

for the entry of this order, entered by a judge who retired from the bench more than ten (10) years

ago. Perhaps the court "appointed" House as special counsel to the Debtors to provide some type

of a "comfort" order, making it clear to all concerned that, in case there was any doubt under 11

U.S.C. §330(a)(4)(B), House was entitled to compensation from the bankruptcy estate.

Whatever the rationale for the appointment order,[35] it was not an order authorized or

---

[34](...continued)
derived from a chapter debtor's future income stream paid over to the chapter 13 trustee as plan
payments).  That outcome would undermine the chapter 13 system insofar as it would make it virtually
impossible for most chapter 13 debtors to obtain representation.  Consequently, §330(a)(4)(B) authorizes
the allowance of compensation "to the debtor's attorney" based on the benefit and necessity of those
services "to the debtor," (not based on the benefit of the services to the bankruptcy estate).

[35]        I have considered whether House's appointment as special counsel was rooted in 11
U.S.C. §1303, which gives the chapter 13 debtor, exclusive of the trustee, the right to use estate property
and therefore, prosecute prepetition claims that are property of the bankruptcy estate.  The notion, then,
might be that when the debtor exercises this right, the debtor is acting like a trustee and must comply
with 11 U.S.C. §§327, 330.  There are two (2) flaws in this reasoning, however.  First, a chapter 13

(continued...)

required by the Bankruptcy Code; it was legal surplusage.  It follows that Bankruptcy Code

requirements for the retention of counsel and local rule requirements for the withdrawal of an

appearance of an attorney who has entered an appearance in the bankruptcy court have no

applicability to an attorney representing a chapter 13 debtor in a non-bankruptcy matter in a non-

bankruptcy forum.[36]  This leaves in place Pennsylvania law as the source of law for determining

when House's representation of Olick as special counsel ceased.


### E.  Olick Terminated the Attorney-Client Relationship with House No Later than February 3, 1999

House was retained in April 1997.  By March 1998, Olick sent letters to the chapter 13

trustee and to House complaining about House's representation in the NASD Arbitration.

In the March 20, 1998 letter he faxed to House, Olick acknowledged that House had advised him

that House was withdrawing from the NASD Arbitration representation.  While Olick's letter

may be equivocal in certain respects, he seemed to accept House's withdrawal from the NASD

Arbitration as a fait accompli.  The letter stated unequivocally that Olick would file a motion in

---

[35](...continued)
debtor's power to "use" estate property and prosecute prepetition causes of action is not the exercise of a
trustee power.  11 U.S.C. §1303 does not state that the debtor may exercise the trustee' §363(b) powers.
It states that, "exclusive of the trustee," the debtor has those powers – again drawing a distinction
between the debtor and the trustee.  Second, the argument proves too much.  Chapter 13 debtors need not
retain special counsel to exercise §363 powers authorized by §1303.  They may so through their general
bankruptcy counsel and there is no obligation to obtain court authority to retain general bankruptcy
counsel.

[36]        With respect to House's status as general bankruptcy counsel, **where he had entered his
appearance in the bankruptcy court,** local rules regarding the effect of his entry of appearance and the
procedure for withdrawing as counsel were applicable (and were followed).

the bankruptcy court to discharge House and he did file such a motion.  The Olick March 1998

Motion to Discharge Counsel, dated just a few days after the letter, sought to discharge House

and specifically referred to House's inadequate representation in the NASD Arbitration.  See Part

III.D, supra.

Considering that bankruptcy court regulation of the House-Olick attorney-client

relationship was unnecessary, Olick's March 1998 letter to House, followed by the filing of the

Olick March 1998 Motion to Discharge Counsel arguably constituted "notice of [Olick's] clear

intention  .   .   to dismiss" House.  Sacerdote, 74 B.R. at 489.  Similarly, in his December 7,

1998 letter to the bankruptcy court clerk, Olick declared that he had terminated House's

representation.  But, in light of all of the confusion regarding House's status, even though it is

clear that the attorney-client relationship had broken down completely and Olick unequivocally

expressed his intent to discharge House, I am reluctant to base a decision on these facts alone.  It

is possible that Olick believed that House continued to owe him duties as counsel until the

bankruptcy court terminated the "appointment" as special counsel.

But no matter, there is a "smoking gun" in the record demonstrating that House's status

as special counsel terminated well before the end of the NASD Arbitration.  The smoking gun is

the Olick February 1999 Pro Se Motion that Olick filed on February 1, 1999.[37]   In that motion,

Olick requested permission to proceed pro se in the NASD Arbitration.  The motion was granted

on February 3, 1999.

---

[37]  The district court did not factor the bankruptcy court's order granting the Olick February 1999
Pro Se Motion into the analysis.

Once the Olick February 1999 Pro Se Motion was granted, authorizing Olick to proceed

pro se in the NASD Arbitration, it is indisputable, and no reasonable factfinder could find

otherwise, that the attorney-client relationship between Olick and House was severed with

respect to the NASD Arbitration.

### F.  The Effect of the Pennsylvania Discovery Rule

As stated in Part VI.C. above, Pennsylvania imposes a two (2) year statute of limitations

on tortious conduct, including legal malpractice claims and a four (4) year statute of limitations

for breach of contract claims. See 42 Pa. C.S. §§ 5524, 525(a)(8).  "Pennsylvania favors strict

application of statutes of limitations." Knopick v. Connelly, 639 F.3d 600, 606 (3d Cir. 2011);

accord Kingston Coal Co. v. Felton Min. Co., 690 A.2d 284, 288 (Pa. Super. Ct. 1997) . Whether

the statute has run is usually a question of law.  Knopick, 639 F.3d at 606.  In a legal malpractice

case, "the trigger for the accrual of a legal malpractice action, for statute of limitations purposes,

is not the realization of actual loss, but the 'occurrence' of a breach of duty."  Ferretti, 935 A.2d

at 572 (Pa. Super. Ct. 2007).  This principle is referred to as "the occurrence rule."

In both Count I (breach of contract) and Count III (negligence/legal malpractice), Olick's

claims against House centered on what he considered to be House's inadequacies in prosecuting

the claims in the NASD Arbitration before House withdrew or was terminated by Olick.  These

asserted breaches of House's duties occurred prior to and were known to Olick as of February 3,

1999, when the court granted the Olick February 1999 Pro Se Motion.  To the extent that Olick's

complaint includes the notion that House improperly abandoned the representation, leaving Olick

helpless in the NASD Arbitration (as improbable as that argument is given Olick's affirmative

action in filing the Olick February 1999 <u>Pro Se</u> Motion), that asserted breach of House's duties,

too, was known to Olick as of February 3, 1999.  Therefore, arguably February 3, 1999 is the

latest date for the breach of duty and the latest date the limitations periods commenced.

Employing the date of February 3, 1999, the four (4) year limitations period applicable to

Count I expired on February 3, 2003 and the two (2) year period limitations period applicable to

Count III expired on  February 3, 2001.  Both dates precede the March 3, 2003 commencement of

<u>House III</u>.  Consequently, if the limitations period commenced on February 3, 1999, the

Pennsylvania's savings statute cannot not "save" <u>House IV</u> based on the March 2003 filing of

<u>House III</u>.

That said, I am reluctant to base summary judgment on this analysis due to the

Pennsylvania "discovery rule."  The discovery rule is an exception to the "occurrence rule" and a

"judicially created device that tolls the running of the applicable statute of limitations until the

point where the complaining party knows or reasonably should know that he has been injured

and that his injury has been caused by another party's conduct."  <u>Creghan v. Procura Mgmt., Inc.</u>,

91 F. Supp. 3d 631, 649 (E.D. Pa. 2015), reconsideration denied, 2015 WL 12834402 (E.D. Pa.

Mar. 23, 2015) (quoting <u>Morgan v. Petroleum Products Equipment Co.</u>, 92 A.3d 823, 828 (Pa.

Super. Ct. 2014) (internal citation and quotation marks omitted).  A plaintiff bears the burden of

demonstrating his or her "inability to know of the injury despite the exercise of reasonable

diligence." <u>Foulke v. Dugan</u>, 187 F. Supp.2d 253, 258 (E.D. Pa. 2002).

In the circumstances presented, the discovery rule potentially could result in a finding that

the statute of limitations commenced on July 20, 2001, the date employed by the district court,

because it is plausible that Olick was not aware that he had suffered any cognizable damage until

the conclusion of the NASD Arbitration.  If so, and if the Pennsylvania savings statute applies,

the filing of House III would "save" House IV.

Issues relating to the discovery rule are fact issues reserved for the factfinder and are not

decided by the court on summary judgment unless reasonable minds could not differ on the

subject.  See, e.g., Wilson v. El-Daief, 964 A.2d 354, 361-62 (Pa. 2009).  At summary judgment,

I am obliged to make all reasonable factual inferences in favor on the non-moving party.  Those

inferences might permit a reasonable factfinder to find that the discovery rule deferred the

commencement of the statute of limitations to July 20, 2001.  Thus, there is an issue of material

fact that makes it inappropriate to grant House summary judgment based solely on the undisputed

fact that his representation of Olick in the NASD Arbitration terminated on February 3, 1999.


## G.  The Pennsylvania Savings Statute Does Not Apply

This leaves one final legal issue: whether the Pennsylvania savings statute applies in this

case.  House IV, filed on February 4, 2010, more than nine (9) years after the July 20, 2001 date

used by the district court for the commencement of the limitations period.  Thus, House IV was

out of time, unless the Pennsylvania savings statute applies.

Binding Third Circuit precedent compels the conclusion that the Pennsylvania "savings

statute" does not apply in this case.  It follows that House is entitled to summary judgment due to

the expiration of the statute of limitations prior to the commencement of House IV.[38]

---

[38]   I recognize that this holding differs from that of the district court in its remand decision.

While I accord the district court's decision considerable deference, it is not binding as
"law of the case."  Law of the case is a doctrine providing that a decision by a court on a rule of law

(continued...)

42

The controlling precedent is <u>Jewelcor Inc. v. Karfunkel,</u> 517 F.3d 672 (3d Cir. 2008).

In <u>Jewelcor</u>, the plaintiff first filed an action in the bankruptcy court in November 1994, based on a cause of action that accrued in August 1991.  The initial action was dismissed for lack of subject matter jurisdiction on February 9, 1999.  On July 15, 1999, the plaintiff filed a new complaint asserting the same claims in federal district court.  Relying on the Pennsylvania savings statute, the district court rejected the defendant's argument that the claim should be dismissed due to the expiration of the statute of limitations and, after a trial, entered judgment in favor of the plaintiff.  The Third Circuit reversed.

In the appellate decision, the <u>Jewelcor</u> court observed: "Though [the text of 42 Pa.C.S. 5535(a)] is general in scope, Pennsylvania appellate courts interpret the provision to apply **only when a civil action is commenced in and terminated by a Pennsylvania state court**." <u>Jewelcor</u>, 517 F.3d at 675 (emphasis added).  The court cited Pennsylvania precedent for the proposition that federal actions do not toll the running of the statute of limitations on actions subsequently brought in a state court.  <u>Id.</u> (citing <u>Maxwell Downs v. City of Philadelphia</u>, 638

---

[38](...continued)
should continue to govern the same issues in subsequent stages of the same case. <u>See</u> <u>In re Cont'l Airlines, Inc.</u>, 279 F.3d 226, 233 (3d Cir. 2002); <u>In re Jamuna Real Estate, LLC</u>, 392 B.R. 149, 169 (Bankr. E.D. Pa. 2008).  However, the doctrine is not employed when the earlier decision was in the context of a motion to dismiss.  <u>See, e..g.</u>, <u>In re Integrated Health Servs., Inc.</u>, 358 B.R. 637, 641 (Bankr. D. Del. 2007) (citing authorities).  Further, law of the case is a prudential doctrine, not one that limits the power of the court, <u>e.g.</u>, <u>Rozzelle v. Rossi</u>, 2007 WL 2905728, at *5 (W.D. Pa. Sept. 30, 2007),  and "not . . .  an inflexible straightjacket."  <u>Speeney v. Rutgers</u>, 2016 WL 7165881, at *2 (3d Cir. Dec. 8, 2016) (nonprecedential) (quoting <u>Bethlehem Steel Exp. Corp. v. Redondo Constr. Corp.</u>, 140 F.3d 319, 321 (1st Cir. 1998)).  Nor does the "mandate rule" preclude consideration of the limitations issue on the merits. <u>See, e.g.</u> <u>In re Scarborough</u>, 2009 WL 2916971, at *3 (Bankr. E.D. Pa. Apr. 8, 2009) (lower court may depart from appellate mandate if necessary to correct a clear legal error), <u>aff'd</u> 389 Fed.Appx. 184 (3d Cir. July 26, 2010).

A.2d 473 (Pa. Commw. Ct. 1994)).  <u>Jewelcor</u> went on to hold that if the savings statute does not

preserve a claim initially filed in state court and subsequently filed in federal court, it does not

save an action filed both initially and subsequently in federal court.  <u>Id.</u> at 676.

The facts and procedural history in this adversary proceeding are materially

indistinguishable from <u>Jewelcor</u>.  In <u>Jewelcor</u>, both actions were filed in federal (district) court.

Here, both <u>House III</u> and <u>House IV</u> were filed in federal (bankruptcy) court.  Thus, the outcome

here must be the same  –  the Pennsylvania savings statute does not apply.  <u>House IV</u>  –  filed

more than eight (8) years after July 20, 2001, the latest possible limitations commencement and

more than eleven (11) years after the earlier February 3, 1999 potential limitations

commencement date (the date House was terminated as special counsel)  – was untimely.


## VII.  CONCLUSION

This dispute is nearly twenty (20) years old, worthy of comparison to <u>Jarndyce v.</u>

<u>Jarndyce</u>, the fictional case that threatened "to go on forever."  <u>Scales v. United States</u>, 79 S. Ct.

1444, 1446 (U.S. 1959), <u>amended</u>, 80 S. Ct. 858 (U.S. 1960) (citing C. Dickens, <u>Bleak House</u>).

Finally, after all that time, it has reached summary judgment, the stage of civil litigation that is

designed to conclude litigation, without trial, in appropriate circumstances, <u>i.e.</u>, when there are no

issue of material fact and one (1) party is entitled to judgment as a matter of law.

As explained above, the circumstances are appropriate for the entry of summary judgment

in this adversary proceeding on two (2) alternative grounds: (1) Olick lacks the evidence

necessary to prove all of the elements of his claims; and (2) the undisputed facts in the record

demonstrate that Olick's claims are barred by the statute of limitations.

Consequently, judgment will be entered in House's favor and against Olick. An

appropriate order follows.


Date:  **March 20, 2017**        _____

**ERIC L. FRANK**

**CHIEF U.S. BANKRUPTCY JUDGE**


cc:    Thomas W. Olick

4014 Crestview Avenue

Easton, PA 18045